**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KAREN AMAYA, | ) | |
| 3895 Mt. Pleasant Rd. | ) | |
| Waldorf, MD 20601 | ) | |
| | ) | Case No.: |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | **JURY TRIAL DEMANDED** |
| Serve:  Brian Schwalb | ) | |
| Attorney General | ) | |
| 400 6th St. NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

**COMPLAINT**

Comes now Plaintiff, Officer Karen Amaya (hereinafter "Plaintiff" or "Off. Amaya"), by

and through undersigned counsel, with her COMPLAINT, alleging multiple violation of the law

on the part of her employer, District of Columbia Metropolitan Police Department (hereinafter

"MPD"), and states as follows:

**INTRODUCTION**

Plaintiff is a Latina female officer who has been employed by MPD for eight (8) years.

However, Plaintiff was assigned to a department that did not value her as a human being, and

allowed her to be treated atrociously by her male supervisors.  In July of 2015, Plaintiff filed a

formal complaint against a supervisor because he asked her if she enjoyed shoving big things into

herself, or words to that effect, in a context that was absolutely humiliating to Plaintiff.  There is

no context in which such a comment would be acceptable between a superior and subordinate.  But

1

given the Sergeant's control of Plaintiff, and the public way he made the comment, it crossed a line that caused Plaintiff to take action.

Immediately after doing so, the Sergeant placed a bullseye on Plaintiff's back, and she became the victim of a relentless and coordinated campaign to break her spirit and push her out of MPD.  This type of sophisticated and coordinated scheme to place an officer in constant disciplinary jeopardy, always in fear and on the defensive was described in detail and referenced in *Brinkley v. District of Columbia*, Case No. 1:21-CV-01537 (RBW), in which ten long-tenured African American women officers, including an Assistant Chief of Police, brought a class action suit to address MPD's longstanding pattern and practice of retaliation against women who complain about gender and race discrimination.

In that case, the Plaintiffs described MPD's practice of ganging up on officers who displease people in power for the express purpose of bullying them into resignation, or manufacturing a reason to terminate them.  The instant Complaint outlines how Plaintiff became the victim of this exact scheme, because she got a very senior Sergeant in trouble for saying something that no rational or decent leader would ever say to a subordinate female.  Nearly all of the repeated efforts to suspend Plaintiff, and to evaluate her as an unsatisfactory employee were eventually reversed or dramatically modified because they were frivolous or unwarranted, but not until Officer Amaya had to expend substantial time and emotional energy fighting them. MPD, rather than taking appropriate and needed corrective action against the Sergeants who dogging Officer Amaya's every step, allowed the Sergeants on her shift to turn Plaintiff's work life into a living hell of never ending attack, denigration and frivolous and unjustified disciplinary action.

MPD's retaliation against Officer Amaya was incessant, and without any moral boundaries whatsoever.  When Plaintiff began to suffer from preeclampsia during two pregnancies, a very

serious and potentially life-threatening condition, MPD's coordinated scheme to harm her did not abate one iota.  It escalated.  Simple measures and accommodations that would have made it possible for Plaintiff to remain at work, and to succeed on a promotional exam, were denied to her out of pure spite.  Common courtesies that were routinely allowed to other officers, were denied to her.  Thus, when it came time to deliver her baby, Plaintiff's precarious medical condition was exacerbated to the life-threatening level because of MPD's callous indifference to her wellbeing, and its total disregard for common decency.

Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"), and The Civil Rights Act of 1866, 42 U.S.C. § 1981(a), 42 U.S.C. 1981, by way and through 42 U.S.C. § 1983, the Americans with Disabilities Act of 1967, 42 U.S.C. 126, § 12101 *et seq.*, the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601 *et seq.,* the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the District of Columbia Family and Medical Leave Act (DCFMLA), D.C. Code §§ 32-501, *et seq.*

In it, she seeks compensatory damages for the severe and relentless stress, and mental, emotional and physical harm that she suffered as a result of Defendant's intentional scheme to retaliate and discriminate against her.  She seeks not less than $5,000,000.00 in damages, as well as a make whole remedy that compensates her for all of her losses, including interest, fees, costs and attorney's fees.  Plaintiff also seeks declaratory judgment holding that MPD's policies with respect to pregnant officers are unconstitutional, discriminatory and violate federal law, and on ORDER to make her whole by promoting her to Sergeant retroactive to the last posting of the promotional register.

**THE PARTIES**

1.      Plaintiff is a Latina female sworn officer of MPD.  She is a resident of Maryland.

2.      Defendant District of Columbia is a municipality.  MPD is a department of that municipality, under the control of the Mayor of the District of Columbia, and its City Council.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as it asserts claims that arise under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"), and The Civil Rights Act of 1866, 42 U.S.C. § 1981(a), 42 U.S.C. 1981, by way and through 42 U.S.C. § 1983, the Americans with Disabilities Act of 1967, 42 U.S.C. 126, § 12101 *et seq.*, and the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601 *et seq*.

4.      This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.,* and the District of Columbia Family and Medical Leave Act (DCFMA), D.C. Code §§ 32-501, *et seq*.

5.      Venue is proper in the District of Columbia under 28 U.S.C. § 1331 and 29 U.S.C. § 1402 because substantially all the acts and omissions that give rise to this complaint occurred in the District of Columbia.  Venue properly lies within this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).  This Court is also the proper venue to adjudicate Plaintiff's state law claims.

**RELEVANT FACTS**

6.      Plaintiff began her tenure at MPD in July of 2015.  She completed the academy and was assigned to the Second Patrol District (hereinafter "2D").

4

7.      At 2D, Plaintiff worked on the midnight shift with a group of male Sergeant who were all friends with each other, and had all been at 2D for a substantial period of time.  The ringleader of this group was Sergeant John Hedgecock (hereinafter "Sgt. Hedgecock").

8.      Sgt. Hedgecock was the most senior sergeant and was actually a Senior Police Officer (hereinafter "SPO"), which is a retired officer who comes back to work full time as a contractor.

9.      Importantly, SPO Sergeant can be terminated without just cause protections that are applicable to union-member sworn officers.

10.     Also in this group of male Sergeants was Sergeant Christopher Woody (hereinafter "Sgt. Woody"), Sergeant William Heckerman (hereinafter "Sgt. Heckerman"), Sergeant Gregory Alemian (hereinafter "Sgt. Alemian"), Sergeant Travis McGuire (hereinafter "Sgt. McGuire") and Sergeant Peter Hunt (hereinafter "Sgt. Hunt").

11.     These Sergeants frequently worked together, were very friendly with each other, and held a great deal of sway over their subordinates.

12.     In November of 2017, Plaintiff filed an internal complaint against the ringleader, Sgt. Hedgecock, alleging that he made sexually offensive and harassing comments to her, and when she opposed his behavior he singled Plaintiff out for tasks and duties that officers did not have to do.

13.     Specifically, Sgt. Hedgecock made reference to Plaintiff enjoying sticking large things in her body, or words to that effect.  The comment was made as a sexual reference.

14.     Plaintiff went to her union representative to complain about Sgt. Hedgecock's behavior. The matter was then escalated to Commander Melvin Gresham (hereinafter "Cdr. Gresham"), and Lieutenant Allen Hill (hereinafter "Lt. Hill").

15.     Cdr. Gresham then recommended that Plaintiff file an EEO complaint, which she did.

16.     Plaintiff asserts that this first report of harassment and retaliatory treatment constituted protected activity, and formed the basis of Defendant's pattern, practice and campaign of disparate and retaliatory treatment against Plaintiff.

17.     As a result of having complained about Sgt. Hedgecock and getting him into trouble with management, Sgt. Hedgecock and his posse of close male colleagues made a concerted and collective effort to bully, harass, undermined, and drum Plaintiff out of her employment.

18.     Over the next years, these men collaborated to give Plaintiff no peace and to launch frivolous investigation, after frivolous investigation against her, placing Plaintiff in constant jeopardy and causing her to suffer both mentally and financially.

19.     The campaign against Plaintiff began *immediately (within days)* after her November 2017 complaint reporting Sgt. Hedgecock's behavior.

20.     He retaliated against Plaintiff by opening up a frivolous and unwarranted investigation into Plaintiff for allegedly failing to take in a cruiser computer to be repaired, when in reality, Sgt. Hedgecock *denied Plaintiff permission* to do so, unless and until he gave her that specific direction, which he failed to do.

21.     Essentially, Sgt. Hedgecock manufactured a reason to discipline Plaintiff out of whole cloth, based on a situation in which he had total control, and Plaintiff had to follow his direction.

22.     Plaintiff was suspended for 15 days as a result of the retaliatory investigation, which was an excessive amount for a first offense, and was out of norm of MPD's progressive discipline practices.

23.     Thus, the result of Plaintiff's complaint was that Sgt. Hedgecock was not disciplined for the outrageous comments he made to Plaintiff and his disparate and harassing treatment of her, but Plaintiff was subjected to a serious disciplinary action for doing so.

24.    On or about December 14, 2017, Plaintiff filed an internal EEO complaint alleging that she was being retaliated against for engaging in protected activity against Sgt. Hedgecock.

25.    Unfortunately, by then MPD's EEO Department was under the control of Alphonso Lee (hereinafter "Mr. Lee"), who, as will be elaborated herein, had a policy of obstructing, subverting and invalidating claims of race and/or gender discrimination against MPD officials.

26.    On or about February 19, 2018, Plaintiff was investigated again, this time by Sgt. McGuire and given another proposed fifteen (15) day suspension for allegedly failing to monitor the radio and respond in a timely manner.

27.    Plaintiff had responded to the call in the 2-3 minute timeframe that was expected, so the entire matter was another manufactured retaliation.

28.    When Plaintiff asked why she was being disciplined when she did not violate any rule, she was informed that it was the dispatcher who initiated the investigation.

29.    When Plaintiff reached out to the dispatch supervisor, the supervisor responded in an email that he had not initiated an investigation against Plaintiff.  Thus, the representation from her superiors was false, and clear pretext to hide retaliation.

30.    When it was clear that Plaintiff did not miss the dispatch call from the dispatcher, Defendant changed the charge against her to simply not monitoring the radio.

31.    Again, this allegation was not supported by the evidence, and was a phony and manufactured attempt to harm Plaintiff for engaging in protected activity.

32.    Just days later, on or about February 23, 2018, Plaintiff was subjected to yet another disciplinary action, this time by Sgt. Hunt.

33.    Sgt. Hunt set up Plaintiff by ordering her to change and downgrade the classification of a burglary report to a lost property report, and then initiating an investigation into her for following his orders.

34.    Plaintiff was again suspended for 15 days, which is one of the harshest disciplinary actions at MPD.

35.    When Plaintiff indicated that she would fight the suspension at the Office of Employee Appeals (hereinafter "OEA"), MPD lowered the suspension to seven (7) days, to take it out of OEA's jurisdiction.

36.    Despite Plaintiff's protest that she only changed the classification because *she was told to do so by Sgt. Hunt*, Plaintiff was disciplined, but Sgt. Hunt was not.

37.    Plaintiff asserts that she was disciplined for actions that were initiated by Sgt. Hunt because of her race and gender, and as a form of retaliation for engaging in protected activity.

38.    On or about March 20, 2018, Sgt. Heckerman followed up Sgt. Hunt's retaliatory action by initiating yet another investigation, and recommended that Plaintiff be suspended for allegedly neglecting her duty (missed run).

39.    This allegation was also without basis in fact, and was eventually reduced to a reprimand, even though the dispatcher did not allege that Plaintiff had violated policy or failed to respond to a call.

40.    From December of 2017 to March of 2018, a span of *only four months*, Plaintiff was subjected to five disciplinary investigation and four suspensions.  Prior to her protected activity, Plaintiff had not been suspended at all.

41.    This pattern and campaign of reprisal is reserved for those officers who so displease people in power at MPD, that they become *persona non grata*, and multiple people gang up on them to push them out.

42.    Despite her numerous and repeated pleas to management begging to be transferred to a different department, and the several EEO complaints she filed about being bullied and retaliated against by the male Sergeants in 2D, Plaintiff's requests were ignored.

43.    On or about June 6, 2018, Plaintiff timely filed an OHR complaint challenging the suspension for the incident with Sgt. Hedgecock in OHR Charge No. 19-040-DC.

44.    On or about August 19, 2018, Plaintiff amended OHR complaint 19-040-DC to include the suspension related to allegedly not monitoring the radio.

45.    OHR transferred the investigation of claim 19-040-DC to the EEOC which generated EEOC Charge No. 10C-2019-00029, which in turn issued a Notice of Right to Sue Letter on or about February 24, 2023.  That matter is now ripe and before this Court for adjudication.

46.    After Plaintiff filed her OHR complaint, which constitutes further protected activity, Plaintiff's performance evaluation was dropped to level 1 (unsatisfactory), the lowest possible level.  Prior to her protected activity, she was rated as a 3, meets expectations.

47.    Plaintiff's evaluation was done by Sgt. Heckerman, who was not her direct supervisor, and Plaintiff was never informed that he was going to be evaluating her.

48.    The evaluation that rated Plaintiff as a 1 (unsatisfactory) violated MPD General Order 201.20, which requires that an evaluator hold a conference with each person in danger of being rated unsatisfactory, to discuss the performance during the rating cycle.  Sgt. Heckerman never performed this conference for Plaintiff.

49.     Furthermore, the General Order requires that a form 62-D be used to inform a person who is in danger of receiving an unacceptable annual performance rating at least ninety (90) days prior to issuing the rating, to give the individual an opportunity to improve their deficiencies.

50.     No such form or warning was ever given to Plaintiff.

51.     Additionally, Plaintiff's electronic signature was fraudulently applied to the evaluation, because the electronic signature was submitted from Plaintiff's work computer at a time when Plaintiff was off duty and away from the office.

52.     Moreover, Sgt. Heckerman should not have done the evaluation because Plaintiff had specifically named him in her previous EEO complaint.   He had a patent conflict of interest.

53.     Plaintiff was forced to spend months appealing the evaluation.  She ultimately prevailed and her rating was brought up to a level 3.

54.     However, no corrective action was taken against Sgt. Heckerman for falsely and maliciously downgrading Plaintiff to a level 1, for violating general orders in the preparation of the performance evaluation, and for falsely representing that Plaintiff had signed the evaluation.

55.     Nor was any action taken against Sgt. Heckerman for issuing a performance evaluation that was clearly dishonest and retaliatory in nature.

56.     Plaintiff had to endure this retaliatory scheme, and fight for her career and future while she was pregnant with a high-risk pregnancy.

57.     Plaintiff asserts that she was endured enormous mental and emotional anguish because of the retaliation she was subjected to at work, and because of MPD's dysfunctional EEO department that would take no steps to intervene and protect her.

58.    On or about January 23, 2019, Plaintiff gave birth to a baby girl.  Plaintiff suffers from pre-eclampsia, which is a condition that causes dangerously high blood pressure in pregnant women, and can easily be fatal to both mother and fetus.

59.    Plaintiff asserts that the stress and harassment that she was experiencing at work contributed to her condition and put both her and her baby and serious risk.

60.    On or about November 5, 2019, Plaintiff filed an OHR complaint (20-235-DC) alleging that the reduction in her performance evaluation constituted retaliation for protected activity.  That complaint was transferred to the EEOC and was consolidated with EEOC charge 10C-2019-00029.

61.    In January of 2020, Plaintiff was further retaliated against when Sgt. Alemian attempted to write Plaintiff up for disciplinary action for alleged insubordination.

62.    Sgt. Alemian accused Plaintiff of not completing an assignment fast enough (immediately), when he never gave Plaintiff that instruction.  Plaintiff completed the assignment prior to the end of her shift and did nothing wrong.

63.    Because Sgt. Alemian's allegation against Plaintiff was not substantiated, no disciplinary action ensued, however, Sgt. Alemian was not satisfied, and set about tracking all of Plaintiff's movements in order to find or manufacture a reason to discipline her.

64.    On or about February 22, 2020, Plaintiff was verbally reprimanded by Sgt. Alemian for a call that occurred the day before.  He again accused Plaintiff of insubordination for failing to respond quickly enough to a non-emergency secondary request for service that was cancelled by the 2D dispatcher.

65.    Plaintiff asserts that non-emergency requests do not require immediate response, and that she responded in a timely and appropriate manner, consistent with what her colleagues typically do.

11

66.    Sgt. Alemian recruited his ally, Sgt. Woody to conduct the internal investigation in regard to this incident.

67.    On or about February 27, 2020, Plaintiff was informed of a proposed twenty (20) day suspension for the alleged insubordination.

68.    Once again, Plaintiff was forced to spend tremendous energy defending herself from unwarranted and unjustified retaliatory discipline.

69.    In May of 2020, Plaintiff became pregnant with her third child, and once again suffered from a high-risk pregnancy.

70.    On or about September 23, 2020, Plaintiff was suspended for 12 days by Chief Peter Newsham (hereinafter "Chief Newsham") for one of the frivolous investigations into her actions.

71.    Chief Newsham was personally involved in the disciplinary process and was the ultimate decision-maker and driving force in Plaintiff's suspension.

72.    Plaintiff filed an internal EEO complaint about this suspension, which she alleges was retaliatory, and part of a pattern and practice of gender and race discrimination and retaliation.

73.    On or about December 2, 2020, when she was issued an exit letter from MPD EEO, Plaintiff amended OHR complaint (21-085-DC) to add the additional allegation.

74.    This claim was also transferred to the EEOC and consolidated under charge no. 10C-2021-00064. Plaintiff received a Notice of Right to Sue on this EEOC Charge on or about February 24, 2023, and the matter is ripe for adjudication.

75.    Plaintiff asserts that the kind of relentless attack and bullying that she was subjected to by the group of male Sergeants in 2D caused severe emotional distress, and is a form of trauma that has had long term and enduring effects on her mental health.

76.     Plaintiff asserts that expert testimony will establish that the physical impacts of such stress can be as dangerous as high risk activities such as smoking or taking drugs.

77.     Plaintiff repeatedly begged to be transferred out of 2D, and away from the group of Sergeants who had targeted her for retaliation, but her requests were always denied.

78.     MPD frequently moves officers between departments for a variety of reasons.  It was not hardship whatsoever for MPD to move Plaintiff to another department.

79.     The denial of a transfer was intentional, targeted and designed to be punitive, and to prevent Plaintiff from getting a fresh start in another department, or to be able to avoid the constant and relentless bullying of the Sergeants on her shift.

80.     Plaintiff asserts that Chief Robert Contee (hereinafter "Chief Contee"), as well as Chief Newsham were personally involved in preventing her from being transferred away from the crew of male Sergeants who were targeting her for retaliation.

81.     On or about December 19, 2020, Plaintiff gave birth to a premature baby boy.  Her son suffered from a variety of ailments and spent two months in the NICU.  Immediately after being delivered, he had to be given two blood transfusions, and barely survived.

82.     Plaintiff asserts that her pregnancy was complicated, and her son was born two months prematurely because of the constant unjustified and retaliatory harassment she was subjected to because of the animus of the midnight shift male Sergeants in 2D.

83.     Because Plaintiff had irritated the ringleader of the 2D Sergeants, none of them could find an ounce of decency or compassion for Plaintiff, while she was enduring one of the hardest and most stressful things that can happen to an adult in their lifetimes, the serious illness of a child.

84.     When Plaintiff returned to work after the birth of her son, she was detailed to the office that processes the paperwork for officers that wish to have second jobs or business ventures.

85.     She was scheduled from 5:00 am to 1:30 pm.  This schedule worked well for her because it fit with her parenting duties and allowed her to attend medical appointments for her newborn during the day.

86.     In November of 2021, Plaintiff became pregnant with her fourth child.

87.     Once again, Plaintiff experienced a high-risk pregnancy, which required her to make frequent visits to a high-risk ObGyn practice in Bethesda, MD.

88.     Immediately after Plaintiff reported her pregnancy, she was intentionally moved off of the 5:00 am to 1:30 pm shift, and was placed 6:30 am to 3:00 pm shift, which made it all but impossible to make it to her ObGyn appointments.

89.     Plaintiff asserts that this change in shift was done intentionally, with the specific intent to make things more burdensome on her during pregnancy, and was a form of retaliation.

90.     Because of the illogical and retaliatory change in Plaintiff's work schedule, she was required to file a request for a reasonable accommodation of a change in schedule so she could make her doctor's appointments.

91.     Consistent with Defendant's animus towards Plaintiff, it initially denied Plaintiff's reasonable accommodation request.

92.     Instead of simply giving Plaintiff the accommodation she requested, Sergeant Alexia Austin-Love (hereinafter "Sgt. Austin-Love") and civilian supervisor Rhonda Robinson (hereinafter "Ms. Robinson") suggested that Plaintiff change ObGyn practices in the middle of high-risk pregnancy, and abandon the doctor she had used to safely see her and her three babies through delivery.

93. Sgt. Austin-Love specifically told Plaintiff that MPD did not have to reasonably accommodate her, and that the only reasonable accommodation that Plaintiff would get was the ability to use an elevator instead of the stairs, or words to that effect.

94. Plaintiff filed another EEO complaint, this time asserting pregnancy and disability discrimination, against Ms. Robinson and Sgt. Austin-Love for refusing to give her a reasonable accommodation.

95. In concert with MPD's pattern of callous disregard for Plaintiff's wellbeing, she was given a high-chair to work on, which put extreme stress on her lower back.

96. Plaintiff complained about the chair and asked for one that would be more comfortable for her as her pregnancy proceeded. MPD refused that very simple request.

97. Eventually, Plaintiff's back pain became so severe that she had to take time off from work.

98. When Plaintiff went to the Police and Fire Clinic (hereinafter "PFC") director Matthew Miranda (hereinafter "Mr. Miranda") decided to deny Plaintiff's claim that her injury was work related because he concluded Plaintiff's back pain was solely due to her pregnancy. Mr. Miranda is not a medical professional of any kind.

99. Plaintiff incorporates herein the allegations raised by former officers Kirtriya Thomas, Tabatha Knight and Asst. Chief Chanel Dickerson, about the way MPD treats pregnant officers, and states that Mr. Miranda in particular has a history and pattern of animus and bias against pregnant police officers.

100. Because Mr. Miranda chose to characterize Plaintiff's injury as solely related to her pregnancy, and not related to the fact that Plaintiff was not given a chair suitable to her condition at work, Plaintiff lost out on all of the benefits and support she would have received for a workplace injury.

101.   Plaintiff burned through her earned sick leave as a result of her back injury, and eventually went into an unpaid status while she was preparing for her baby to arrive.

102.   Moreover, while in an unpaid status, MPD relentless and senselessly harassed and attacked Plaintiff, bombarding her with emails and phone calls about picayune things while she was enduring a high risk pregnancy and suffering from high blood pressure.

103.   MPD commitment to aggravating Plaintiff in any way it could is worthy of note, and further demonstrates its intent to discriminate and retaliate against Plaintiff.

104.   On or about March 10, 2022, Plaintiff was disciplined again for allegedly violating a general order when she failed to notify MPD that she was going to a doctor's appointment, while she was on unpaid sick leave during a high-risk pregnancy.

105.   Plaintiff asserts that any general order that requires a pregnant officer on unpaid sick leave to call in and report when she is going to the doctor is unconstitutional, intrusive, unjustified and discriminatory against women.

106.   Plaintiff's discipline was predicated on an MPD officer coming to her home in Maryland, where they have no jurisdiction, unannounced, and knocking on her door and trying to ascertain if she was home.

107.   Plaintiff asserts that this unscheduled visit was a form of harassment, was not justified by any business necessity, and was designed to humiliate, agitate, stalk and harass Plaintiff while she was convalescing with a high-risk pregnancy.

108.   Plaintiff was at home at the time, but she was taking strong medication that made her very drowsy.  She was asleep in a different part of the home.

109.   Plaintiff lives with her common-law husband and his parents, who immigrated from Peru. Plaintiff's in-laws do not speak English.

110.   When Plaintiff's mother-in-law opened the door to Sgt. Austin-Love, she did not understand why there was a police officer at the door, and did not understand what the officer was asking her.  Sgt. Austin-Love does not speak Spanish.

111.   Plaintiff's mother-in-law tried to explain in Spanish that Plaintiff was sleeping due to the medication that she was prescribed.  Sgt. Austin-Love would not leave the matter alone, and tried to further interrogate the mother-in-law.

112.   The following day, Sgt. Austin-Love contacted the Charles County Maryland Police Department (hereinafter "CCPD") to conduct a welfare check on Plaintiff, making the false allegation that Plaintiff could have been a missing or abused person.

113.   There was no basis whatsoever for Sgt. Austin-Love to believe that Plaintiff was missing or abused, and she called the CCPD to further harass and stalk Plaintiff.

114.   Sgt. Austin-Love then wrote up Plaintiff for allegedly failing to call in and inform her that Plaintiff had gone to a medical appointment.

115.   The disciplinary write-up was patently dishonest because Plaintiff was at home at the time.

116.   Even if it was true, which it was not, Plaintiff was under no obligation to report that she was going to a doctor's visit while she was on unpaid sick leave.

117.   Plaintiff asserts that because her leave was protected by FMLA, Defendant engaged in unlawful retaliation by harassing Plaintiff while she was on leave, and further that Defendant retaliated against Plaintiff for taking FMLA leave when it suspended her.

118.   On or about March 19, 2022, Plaintiff was scheduled to take the Sergeant's promotional exam, which she had studied and prepared for.

119.   The promotional exam is not given every year, and there can be long gaps before officers have another chance to seek promotion.

17

120.   While Plaintiff was on sick leave at the time, she rallied herself to take the exam because another opportunity might not have been presented for more than two years, which is the typical amount of time that a promotional exam register is in place.

121.   Because she was on medication that made her drowsy and nauseous, and because she was eight months pregnant, Plaintiff asked EEO Director Lee for a reasonable accommodation of an extra hour to take the exam, because she would need several bathroom breaks, and would need time to work through her bouts of nausea.

122.   Mr. Lee refused Plaintiff the reasonable accommodation.  Instead, he stated that Plaintiff could be seated by the bathroom, which was both humiliating and ineffective and dealing with the impact that taking multiple breaks would have on her time to complete the exam.

123.   Mr. Lee did not engage in any interactive process and did not consult any medical professional with respect to Plaintiff's request.

124.   Plaintiff asserts that her request presented no hardship whatsoever on Defendant, and its decision to refuse her the accommodation was made purely out of animus towards her.

125.   Plaintiff decided to take the exam without the accommodation she requested, because she did not want to wait another two years for an opportunity to be promoted.

126.   Throughout the exam, Plaintiff struggled with migraine headache and nausea.

127.   She ultimately missed the successful score by _two points_.

128.   Plaintiff asserts that had she been given the accommodation she would have scored sufficiently to be promoted to Sergeant.

129.   Defendant's denial of Plaintiff's simple and easily executed accommodation request is yet another instance demonstrating Defendant's animus and disdain towards Plaintiff because of her race and gender, her pregnancy status, and her engagement in protected activity.

130.    Mr. Lee was specifically aware of all of Plaintiff's protected activity because he read and monitored all of the investigations in the EEO office.

131.    Furthermore, as attested to by every EEO counselor who has worked for Mr. Lee, Mr. Lee inserts himself into EEO investigations to ensure that no allegations of discrimination or retaliation are ever substantiated at MPD, no matter how valid they may be.

132.    Plaintiff references and incorporates the allegations in *Carter v. District of Columbia*, Case No. 1:22-CV-00426 (JMC), as if fully stated herein.

133.    The five EEO Counselor Plaintiff in *Carter, supra* alleged that Mr. Lee instructed his EEO counselors to undermine and invalidate Plaintiff's EEO complaints, and that he did so out of manifest animus towards women officers and women of color.

134.    Plaintiff asserts that Mr. Lee's policies and procedures run afoul of, and are counter to EEOC guidance and regulations, and that MPD's EEO department is dysfunctional and fundamentally corrupt as a result of Mr. Lee's leadership.

135.    Plaintiff asserts that her civil and constitutional rights were violated by Mr. Lee by way of his intercession in undermining her EEO claims, and further that asserts that Chief Contee was fully aware of, and on notice of Mr. Lee's sabotage of EEO complainants no later than September 22, 2021, upon the filing of the *Brinkley* case, which was supported by sworn affidavits from EEO counselors about the way Mr. Lee was running the EEO department.

136.    Plaintiff asserts that at some point in late 2021 or early 2022, MPD conducted an external investigation of the EEO Department which revealed that MPD's EEO department was out of compliance with EEOC regulations, was toxic and dysfunctional, routinely violated the privacy rights of complainants, engaged in systematic retaliation to intimidate and undermine the credibility of complainants

19

137.    Despite receiving the results of this investigation in early 2022, being on notice that the MPD's EEO department was out of compliance with EEOC regulations, was toxic and dysfunctional, routinely violated the privacy rights of complainants, engaged in systematic retaliation to intimidate and undermine the credibility of complainants, Chief Contee and Mayor Bowser took no remedial actions whatsoever to curb Mr. Lee's violations of law and policy.

138.    Plaintiff asserts that Chief Contee and Mayor Bowser had a callous indifference to the fact that MPD's EEO department was abusive of the rights of complainants, unreliable and fundamentally corrupt.

139.    On or about April 25, 2022, Plaintiff returned to work from her sick leave related to her back injury, even though she was still experiencing symptoms from her pregnancy.

140.    When she returned to work, she was placed in a different area than when she worked for Ms. Robinson, who tormented Plaintiff on a regular basis, and was the source of much of the bullying Plaintiff was subjected to.

141.    For a few hours everything was fine, until Plaintiff received a call from Mr. Miranda, demanding to know where Plaintiff was stationed that day.  Plaintiff felt she had no choice but to tell Mr. Miranda where she was working.

142.    The following day, Plaintiff was mandated to return to work under Ms. Robinson, and Plaintiff asserts that Mr. Miranda and Ms. Robinson conspired to ensure that Plaintiff was not allowed to escape the harassment and bullying from Ms. Robinson.

143.    Plaintiff was then told that she was going to be disciplined for simply seeking a work location that was less stressful for her, which obviously was very upsetting to her.

144.    In a matter of minutes, Plaintiff's blood pressure escalated so much that she started to feel ill, and went directly to the PFC.

20

145.    When she arrived there, her blood pressure was 190/100 and rising, which is in the acutely high and extremely dangerous range.

146.    Rather than sending Plaintiff directly to the hospital, which would have been appropriate in that circumstance, Plaintiff was just sent home.

147.    Once again, MPD demonstrated callous indifference to Plaintiff's wellbeing, and subjected her to substandard attention and care because she is not valued by MPD management.

148.    When she was nearly home, however, a staffer from the PFC called her and tried to direct her to the hospital, worried that Plaintiff could have a stroke.

149.    Plaintiff was very close to her house and too exhausted to continue driving, so she went immediately to bed, and stayed there until she felt better.

150.    Plaintiff asserts that she was given substandard care at the PFC because of her race and gender, and as a result of Mr. Miranda's animus towards women of color who are pregnant.

151.    Plaintiff references and incorporates the allegations in *Kirtriya Thomas v. District of Columbia*, Case No. 1:23-cv-01378-JMC, which outlines the claims against Mr. Miranda from another woman of color who was pregnant.

152.    In that case, Plaintiff Thomas alleged that Mr. Miranda made several comments to her, and took several actions that demonstrate bias against pregnant officers, including demanding that Plaintiff Thomas cease nursing her infant child.

153.    Mr. Miranda, knowing that Plaintiff was suffering from high blood pressure and a complicated pregnancy, went out of his way to chase her down, subject her to harassment and bullying, and to make her so miserable and agitated that she had to leave the workplace or risk having a stroke.

154.    Mr. Miranda's actions were deliberate, and designed to harm Plaintiff.

21

155.    Defendant has been placed on notice by several pregnant officers in the past that Mr. Miranda is unprofessional, biased, and vindictive towards women officers, particularly pregnant women officers.

156.    Knowing that Mr. Miranda has been accused multiple times of improper behavior, Defendant has opted to take no corrective action whatsoever.

157.    Defendant's failure to curb Mr. Miranda's animus is indicative of Defendant's disregard for female officers when they are pregnant.  Defendant's policies are designed to control and harass pregnant women, not to support them.

158.    Defendant was so outrageously callous and indifferent to Plaintiff's condition, that it served Plaintiff the suspension paperwork from Sgt. Austin-Love's ridiculous harassing visit to Plaintiff's home *while she was in labor and experiencing contractions*.

159.    Defendant knew Plaintiff was going to deliver at any moment, and that she was on bedrest because of the preeclampsia high blood pressure she was enduring.

160.    There was absolutely no reason why Defendant could not have waited until the baby was born to serve Plaintiff that paperwork.

161.    Delivering her baby was incredibly stressful for Plaintiff because the preeclampsia was making her feel extremely ill with a severe headache, and the fear she was enduring because of the complications with the previous pregnancy.  Plaintiff was legitimately terrified for herself and her baby.

162.    Once Plaintiff got to the hospital, things took a turn for the worse.  Her blood pressure continued to skyrocket, and the medication she was being given was ineffective at lowering it.

163.    Plaintiff's baby was delivered by emergency caesarian section, and the baby was born in distress.

22

164. Plaintiff's extremely precarious condition was made much worse because she was worried about MPD's frivolous action against her and her need to defend herself and submit a timely appeal.

165. MPD's absurd and morally reprehensible actions exacerbated an already trying time for Plaintiff, and produced unnecessary stress that risked Plaintiff and her baby's life.

166. Plaintiff's condition after the delivery deteriorated so significantly that she was also given two blood transfusions, and spent more than a week in the hospital post-partum.

167. At a time when Plaintiff's entire focus should have been on keeping herself calm, her peace of mind was invaded, and her emotional state was severely agitated by MPD officers appearing at her door to deliver the suspension papers.

168. It is impossible to overstate how outrageous and ridiculous MPD's actions were.

169. Despite the fact that Plaintiff was released from the hospital and her baby girl is healthy, there were long term impacts to Plaintiff's brain from what happened at the end of her pregnancy, as can be seen on her brain scans, and as her doctors will establish.

170. It bears repeating that Plaintiff and her baby could easily have died from the stress MPD placed on Plaintiff by harassing her and intruding upon her home and family at such a critical time.

171. Plaintiff timely filed an OHR complaint (No. 16203) challenging the frivolous and unjustified disciplinary action that was lobbied against her as being discriminatory and retaliatory against her based on her race and gender, as well as challenging Defendant's failure to accommodate her disability, and its retaliation against her for using FMLA leave.

172. On or about March 24, 2023, OHR dismissed the claim pursuant to Plaintiff's withdrawal to pursue her claim in court, and the matter is now ripe for adjudication and timely filed herein.

173.    Plaintiff also filed a complaint at the Office of Employee Appeals (hereinafter "OEA"), challenging the suspension.

174.    During the course of that matter, Defendant attempted to persuade Plaintiff to settle her claim by simply withdrawing the suspension, but in return, Plaintiff would have to release MPD from liability for what it had done to her.

175.    Plaintiff asserts that Defendant's offer was an effort to bully and confuse her prior to the time when she could obtain counsel of her own.

176.    Defendant has voluntarily withdrawn the suspension without any kind of deal with Plaintiff.  Plaintiff asserts that this action is strong evidence that the suspension was always frivolous and unjustified, and that it should have never been issued.

177.    On or about March 8, 2023, Defendant again reached out to Plaintiff who is still on unpaid sick leave, demanding that Plaintiff attend training and that she regularly report to a sergeant.

178.    Defendant has no right to make such a demand while Plaintiff is in an unpaid leave status.

179.    Plaintiff asserts that Defendant does not make such demands of white men who are on unpaid sick leave.

180.    Plaintiff asserts that Defendant's demand that she engage in work activities while on unpaid sick leave constitutes disparate treatment based on her race and gender.

181.    Plaintiff also asserts that Defendant's actions are part of an ongoing scheme to retaliate against her, agitate and humiliate her, and to subject her to disparate terms and conditions of employment than those similarly situated.

## CLAIMS

### COUNT I

*(Violation of 42 U.S.C. Section 1981 enforced via Section 1983
Based on a Violation of the Fifth Amendment to the Constitution as
Applied to the District of Columbia –
Discrimination Based on Race)*

182.    Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

183.    Plaintiff is a member of a protected group, Latina/Hispanic.

184.    Plaintiff, as an employee of MPD, was in a contractual relationship with Defendant.

185.    Plaintiff asserts that she was subjected to harsher and disparate terms and conditions of employment than her white colleagues because of her race.

186.    Plaintiff asserts that she was provided substandard care at the PFC because of her race, Latina/Hispanic.

187.    Plaintiff asserts that her complaints to the MPD EEO office were improperly investigated and sabotaged because of her race, and because of EEO Director Lee's animus and hostility to women of color.

188.    Plaintiff asserts that Chief Contee, who is an ultimate decision maker, was placed on notice no later than September 22, 2021, by sworn affidavits from MPD EEO counselors, that Mr. Lee was violating EEOC guidelines and policies for the express purpose of invalidating claims of race discrimination.

189.    Despite being on notice that MPD's EEO department was violating the civil and constitutional rights of officers of color, Chief Contee opted to take no corrective or remedial action.

190.   Plaintiff further asserts that Mayor Bowser and Chief Contee, both of whom are ultimate decision makers, were on notice in early 2022 that MPD's EEO department is seriously out of compliance with EEOC regulations due to an external investigation that so stated, and opted to do nothing about it.

191.   As a result of Chief Contee and Mayor Bowser's callous indifference to the impact of a toxic, dysfunctional and retaliatory EEO department on officers of color, Plaintiff's repeated complaints about the way she was being treated were ignored.

192.   As a direct and proximate cause of the MPD's EEO policies, Plaintiff was subjected to disparate terms and conditions of employment than her white colleagues.

193.   Plaintiff seeks to enforce her rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

194.   Plaintiff asserts that she has been victimized by MPD's custom and practice of devaluing, denigrating and subjugating Latina women and women of color, and she incorporates and references the allegations in *Brinkley, supra* in support of her allegation.

195.   Plaintiff further asserts that Chief Contee was the driving force behind Plaintiff being subjected to disparate and unfair terms and conditions of employment.

196.   Had Chief Contee desired it, he could have ensured that Plaintiff's complaints be taken seriously and that the coordinated scheme to bully her into resignation was terminated.

197.   As a direct and proximate cause of the bullying and harassment that Plaintiff was subjected to, and the fact that MPD took no steps to ensure compliance with EEOC regulations, Plaintiff suffered severe mental and emotional anguish, and physical damage to her long term wellbeing.

198.   Defendant also placed Plaintiff's life and the life of her infants at serious and needless risk in order to carry out an intentional scheme to harm Plaintiff.

199.   Plaintiff herein seeks compensatory damages, interest, costs and fees, and attorney's fees of no less than $1,000,000.

## COUNT II

*(Violation of 42 U.S.C. Section 1981 enforced via Section 1983
Based on a Violation of the Fifth Amendment to the Constitution as
Applied to the District of Columbia –
Retaliation Based on Race)*

200.   Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

201.   Plaintiff is a member of a protected group, Latina/Hispanic.

202.   Plaintiff, as an employee of MPD, was in a contractual relationship with Defendant.

203.   Plaintiff engaged in statutorily protected activity when she filed internal complaints about the way she was being treated by Sgt. Hedgecock and others.

204.   Plaintiff engaged in statutorily protected activity when she filed OHR complaints about the way she was being treated.

205.   In close temporal proximity to her statutorily protected activity, Plaintiff was subjected to a retaliatory scheme and coordinated effort to bully her into resigning from MPD.

206.   Plaintiff asserts that she was subjected to coordinated campaign of retaliation from the non-Latino male Sergeants in 2D after she complained about the actions of a supervisor because of her race, Latina/Hispanic.

207.   Plaintiff was subjected to a scheme of serial frivolous and unwarranted disciplinary investigation and actions, misleading and inaccurate performance evaluation, micromanagement

and hyper scrutiny, and stalking by officials who demanded to monitor her every move, even when she was in an unpaid leave status.

208. Plaintiff timely filed multiple internal complaints about the way she was being treated.

209. Plaintiff asserts that her complaints to the MPD EEO department about the retaliation she was being subjected to office were improperly investigated and sabotaged because of her race, and because of EEO Director Lee's animus and hostility to women of color.

210. Plaintiff asserts that Chief Contee, who is an ultimate decision maker, was placed on notice no later than September 22, 2021, by sworn affidavits from MPD EEO counselors, that Mr. Lee was violating EEOC guidelines and policies for the express purpose of invalidating claims of race discrimination.

211. Despite being on notice that MPD's EEO department was violating the civil and constitutional rights of officers of color, Chief Contee opted to take no corrective or remedial action.

212. Plaintiff further asserts that Mayor Bowser and Chief Contee, both of whom are ultimate decision makers, were on notice in early 2022 that MPD's EEO department is seriously out of compliance with EEOC regulations due to an external investigation that so stated, and opted to do nothing about it.

213. As a result of Chief Contee and Mayor Bowser's callous indifference to the impact of a toxic, dysfunctional and retaliatory EEO department on officers of color, Plaintiff's repeated complaints about the way retaliation she was enduring were ignored.

214. As a direct and proximate cause of the MPD's EEO policies, Plaintiff was subjected to disparate terms and conditions of employment than her white colleagues.

215.    Plaintiff seeks to enforce her rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

216.    Plaintiff asserts that she has been victimized by MPD's custom and practice of devaluing, denigrating and subjugating Latina women and women of color, and she incorporates and references the allegations in *Brinkley, supra* in support of her allegation.

217.    Plaintiff specifically alleges that white women at MPD are not subjected to the kind of harassing and bullying that women of color are subjected to, and that this disparate treatment constitutes discrimination based on race.

218.    Plaintiff further asserts that Chief Contee was the driving force behind Plaintiff being subjected to disparate and unfair terms and conditions of employment.

219.    Had Chief Contee desired it, he could have ensured that Plaintiff's complaints be taken seriously and that the coordinated scheme to bully and retaliate Plaintiff into resignation was terminated.

220.    As a direct and proximate cause of the retaliation that Plaintiff was subjected to, and the fact that MPD took no steps to ensure compliance with EEOC regulations, Plaintiff suffered severe mental and emotional anguish, and physical damage to her long term wellbeing.

221.    Defendant also placed Plaintiff's life and the life of her infants at serious and needless risk in order to carry out an intentional scheme to retaliate against and harm Plaintiff.

222.    Plaintiff herein seeks compensatory damages, interest, costs and fees, and attorney's fees of no less than $1,000,000.

29

## COUNTS III & IV

*(Violation of Title VII of the Civil Rights Act of 1967,*
*42 U.S.C. § 2000e, et seq.,*
*and Violation of the DCHRA D.C. Code §§2-1401.01 et seq.*
*– Disparate Treatment Based on Gender/Pregnancy Discrimination)*

223.    Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

224.    Plaintiff is a member of a protected group, female.

225.    Plaintiff alleges that Defendant has promulgated and issued policies that are harmful, invasive, intrusive, infantilizing, unjustified by business purpose and humiliating, that are applicable only to women officers when they become pregnant.

226.    Plaintiff asserts that Defendant's practices and policies regarding pregnant and post-partum women violate EEOC guidelines and discriminate against women.

227.    Plaintiff asserts that Defendant has no right to demand that she change ObGyn physicians in the middle of a high-risk pregnancy and that the demand that she do so was discriminatory because male officers with serious medical conditions are never told to do so.

228.    Plaintiff asserts that the refusal to accommodate her condition, which includes refusing to allow her to keep a shift that allowed her to see doctors when needed, refusing to give her extra time on an exam, and refusing to give her a comfortable chair, were all acts of discrimination, designed to make her as stressed and uncomfortable in her pregnancy as possible.

229.    Plaintiff asserts that she is the victim of a pattern, practice and custom of gender discrimination at MPD, that manifests itself, *inter alia*, by harsh and harassing treatment of women who become pregnant on the job.

230.    Plaintiff incorporates by reference the claims of Officer Tabatha Knight, Karen Amaya and Assistant Chief Chanel Dickerson, in the cases referenced in the paragraphs above.

231.     Plaintiff further incorporates the allegations in *McIntosh v. District of Columbia*, Case No. 1:22-CV-1186, in which Plaintiffs Anari Miller and Remani Wideman outline the pattern of denigrating and humiliating comments, bullying, and callousness of MPD officials towards pregnant women, especially women of color.

232.     Plaintiff asserts that Defendant has been on notice that Mr. Miranda, the Director of the PFC harbors animus towards pregnant officers, and especially pregnant women of color, and has taken no corrective action against him.

233.     Plaintiff asserts that it is wholly inappropriate for Mr. Miranda to engage officers on their choices of physician, or any other choice related to their pregnancy, or child rearing.

234.     Plaintiff asserts that Mr. Miranda does not engage male officers in such a condescending and intrusive way.

235.     Plaintiff also asserts that Mr. Miranda's hounding of Plaintiff and collusion with Ms. Robinson to deny Plaintiff a calm work location was a form of disparate and retaliatory treatment.

236.     Plaintiff was harmed by Defendant's anti-female policies and seeks compensatory damages of not less than $300,000 for each claim, plus attorney's fees, costs, litigation fees and interest.

237.     Plaintiff further seeks declaratory judgment against MPD's policies and practices as they relate to pregnant and post-partum women, most especially with respect to accommodations of the pregnant state and lactation, and mandating that MPD update their policies to reflect best practices in the treatment of pregnant officers.

**COUNTS V & VI**

*(Violation of Title VII of the Civil Rights Act of 1967,
42 U.S.C. § 2000e, et seq.,
and Violation of the DCHRA D.C. Code §§2-1401.01 et seq.
–Gender Based Retaliation)*

238.   Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

239.   Plaintiff is a member of a protected group, female.

240.   Plaintiff engaged in protected activity when she complained about the sexist and inappropriate comments made to her by Sgt. Hedgecock in 2017.

241.   Plaintiff engaged in statutorily protected activity when she filed OHR complaints about the way she was being treated.

242.   In close temporal proximity to her statutorily protected activity, Plaintiff was subjected to a retaliatory scheme and coordinated effort to bully her into resigning from MPD.

243.   Because Plaintiff filed complaints against her supervisors, she was subjected to adverse employment actions in the form of disciplinary suspensions and the issuance of false and noncompliant performance evaluation that rated her as a 1 (unsatisfactory).

244.   Because Plaintiff filed complaints against her supervisors, she was subjected to a relentless scheme of unjustified and frivolous constant denigration, bullying, humiliations and micromanagement that created a hostile work environment for her.

245.   The hostile work environment was severe, pervasive, and intruded on Plaintiff's ability to carry out her duties.

246.   The hostile work environment was so severe that it placed Plaintiff and her unborn children at needless and serious risk of death or major injury.

247.    As a direct and proximate result of Defendant's actions, and its failure to take Plaintiff's internal complaints seriously, Plaintiff suffered severe mental and emotional anguish, and long term mental and physical harm for more than seven years.

248.    Plaintiff was substantially harmed by Defendant's retaliatory action and seeks compensatory damages of not less than $300,000 for each claim, plus attorney's fees, costs, litigation fees and interest.

## COUNTS VII & VIII

*(Violation of Title VII of the Civil Rights Act of 1967,*
*42 U.S.C. § 2000e, et seq.,*
*and Violation of the DCHRA D.C. Code §§2-1401.01 et seq.*
*– Disparate Treatment Based on Race)*

249.    Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

250.    Plaintiff is a member of a protected group, Latina/Hispanic.

251.    Plaintiff alleges that Defendant fosters and maintains a work environment rife with racism and bias against non-white officers, and references and incorporates the allegations in *Brinkley*, supra herein.

252.    Plaintiff asserts that Defendant has a systematic and wholesale policy of devaluing women of color, and that its perpetuation and maintenance of a dysfunctional and non-compliant EEO department is indicative of its animus to non-white officers.

253.    Plaintiff asserts that she is the victim of a pattern, practice and custom of race discrimination at MPD, that manifests itself, *inter alia*, by harsh and harassing treatment of non-white officers.

254. Plaintiff asserts that she was subjected to disparate terms and conditions of employment, including and specifically, harsher discipline than her white colleagues.

255. Plaintiff was harmed by Defendant's discriminatory policies and practices, and seeks compensatory damages of not less than $300,000 for each claim, plus attorney's fees, costs, litigation fees and interest.

## COUNTS IX & X

*(Violation of Title VII of the Civil Rights Act of 1967,
42 U.S.C. § 2000e, et seq.,
and Violation of the DCHRA D.C. Code §§2-1401.01 et seq.
– Retaliation Based on Race)*

256. Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

257. Plaintiff is a member of a protected group, female.

258. Plaintiff alleges that because of her race, she was horribly treated by Sergeants on her shift in 2D, and that white officers were treated more fairly than she was.

259. Plaintiff engaged in statutorily protected activity when she filed OHR complaints about the way she was being treated.

260. In close temporal proximity to her statutorily protected activity, Plaintiff was subjected to a retaliatory scheme and coordinated effort to bully her into resigning from MPD.

261. Because Plaintiff filed complaints against her supervisors, she was subjected to adverse employment actions in the form of disciplinary suspensions and the issuance of false and noncompliant performance evaluation that rated her as a 1 (unsatisfactory).

262. Because Plaintiff filed complaints against her supervisors, she was subjected to a relentless scheme of unjustified and frivolous constant denigration, bullying, humiliations and micromanagement that created a hostile work environment for her.

263. The hostile work environment was severe, pervasive, and intruded on Plaintiff's ability to carry out her duties.

264. The hostile work environment was so severe that it placed Plaintiff and her unborn children at needless and serious risk of death or major injury.

265. As a direct and proximate result of Defendant's actions, and its failure to take Plaintiff's internal complaints seriously, Plaintiff suffered severe mental and emotional anguish, and long term mental and physical harm for more than seven years.

266. Plaintiff was substantially harmed by Defendant's retaliatory policies and practices, and seeks compensatory damages of not less than $300,000 for each claim, plus attorney's fees, costs, litigation fees and interest.

### COUNTS XI & XII

*(Violation of the Family and Medical Leave Act of 1993,*
*29 U.S.C. §§2601 et seq.,*
*and District of Columbia Family and Medical Leave Act, D.C. Code § 32-507*
*--FMLA Interference and Retaliation)*

267. Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

268. Plaintiff was in an unpaid FMLA status when she was out on sick leave due to a back injury.

269. Plaintiff was in an unpaid FMLA status when she was out on sick leave due to her preeclampsia.

270. Defendant intentionally harassed, bullied and stalked Plaintiff, sending incessant emails and calls to her while she was supposed to be convalescing.

271. Defendant's actions were intentional and meant to upset and harm Plaintiff while she was suffering from preeclampsia, a very serious and potentially life-threatening condition.

272.    Defendant, without justification or business purpose, sent a Sergeant to monitor, harass and bully Plaintiff at home, while she was in an unpaid FMLA leave status.

273.    Because of miscommunication between the Sergeant who visited Plaintiff's home and Plaintiff's mother-in-law who only speaks Spanish, Defendant wrongly concluded that Plaintiff was not at home, where Defendant believed Plaintiff should be.

274.    Plaintiff asserts that unpaid FMLA status is not prison or detention, and that there is no rule that prohibits a person from taking care of life needs and being away from home in such a status, thus Defendant had no purpose or justification in coming to Plaintiff's home.

275.    Defendant chose to suspend Plaintiff for erroneously concluding that she was not at home, which constitutes an adverse action.

276.    Plaintiff asserts this adverse action was taken in retaliation for Plaintiff being away from work on FMLA.

277.    Plaintiff asserts that this adverse action was taken to harm her and put her and her baby's life at risk.

278.    Plaintiff challenged the suspension, and for the past year, the suspension has been on appeal.

279.    In April of 2023, Defendant opted to voluntarily withdraw the suspension because it was completely unjustified and unwarranted.

280.    In doing so, Defendant attempted to coerce Plaintiff into releasing it from liability for its unwarranted and retaliatory action against Plaintiff.

281.    Although the suspension ultimately did not take place, Plaintiff was served the suspension paperwork at her home, *while she was in labor* in a high-risk pregnancy.

282. Plaintiff asserts that Defendant's actions in troubling her with a frivolous and unwarranted suspension at such a precarious time in her pregnancy was beyond the pale, and would have a significant chilling effect on others.

283. Plaintiff asserts that Defendant's decision to suspend her for allegedly being away from home while on an unpaid FMLA status would have a chilling effect on others who want to take FMLA leave.

284. Plaintiff further alleges that she is still being subjected to FMLA interference and retaliation because MPD is demanding that Plaintiff conduct work related activities while in an unpaid FMLA status.

285. Defendant has no legitimate reason to interfere with Plaintiff's FMLA leave.

286. As a direct and proximate result of Defendant's actions, Plaintiff suffered serious and material damage.

287. She now seeks compensatory damages of not less than $500,000 for each claim, plus attorney's fees, costs, litigation fees and interest.

## COUNTS XIII & XIV

*(Violation of the Americans with Disabilities Act of 1967,
42 U.S.C. 126, § 12101 et seq., and the
District of Columbia Human Rights Act,
District of Columbia Code § 2-1401.01 et seq.
--Failure to Provide Reasonable Accommodation)*

288. Plaintiff references and incorporates all allegations and assertions in the previous paragraphs as if fully restated herein.

289. Plaintiff suffers from preeclampsia, which is a serious medical condition that causes extremely high blood pressure during pregnancy.

290.    Plaintiff is a qualified person with a disability that affects her during pregnancy.

291.    Plaintiff's disability substantially limits her in the life activities of sitting, standing, reading, walking, concentrating and focusing for long periods of time and strenuous activity.

292.    It also places her life at immediate risk, should her blood pressure rise too high, and requires careful monitoring from a healthcare professional.

293.    Plaintiff requested a reasonable accommodation in the form of remaining on a schedule that allowed her to make it to doctor's appointments during the day. The request constituted no hardship whatsoever on Defendant.

294.    Without engaging in any kind of interactive process, Defendant refused Plaintiff this simple and unobtrusive reasonable accommodation.

295.    There was no business need or justification to deny Plaintiff the accommodation she requested.

296.    Defendant did not seek an opinion from any kind of medical doctor or expert in choosing to deny Plaintiff the accommodation she requested.

297.    During her pregnancy, Plaintiff was on medication that caused her to have to go to the bathroom frequently, and also caused her nausea and severe headaches.

298.    Plaintiff asked for a reasonable accommodation of her disability in the form one extra hour to take the Sergeant's promotional exam.

299.    This extra hour would allow her to take the bathroom breaks she needed without losing time on the test, as well as allow her to manage her bouts of nausea and to take breaks in the exam to rest her mind.

300.    Without engaging in any kind of interactive process, Defendant refused Plaintiff this simple and unobtrusive reasonable accommodation.

38

301. There was no business need or justification to deny Plaintiff the accommodation she requested.

302. Defendant did not seek an opinion from any kind of medical doctor or expert in choosing to deny Plaintiff the accommodation she requested.

303. Plaintiff also suffered from the disability of lower back pain during her pregnancy, due to an on the job injury.

304. Plaintiff developed the injury due to using a tall chair while she was pregnant, which put excessive stress on her lumbar spine.

305. While her pregnancy advanced, the added weight of her pregnant belly exacerbated the pain in her back.

306. Plaintiff asked Defendant for a reasonable accommodation of a different chair or workstation to ease the pain in her back.

307. Without engaging in any kind of interactive process, Defendant refused Plaintiff this simple and unobtrusive reasonable accommodation.

308. There was no business need or justification to deny Plaintiff the accommodation she requested.

309. Defendant did not seek an opinion from any kind of medical doctor or expert in choosing to deny Plaintiff the accommodation she requested.

310. On three separate occasions, Plaintiff made reasonable requests for accommodation of her preeclampsia, and each occasion, without any consideration whatsoever, Defendant denied the requests.

311. In denying these simple and unobtrusive accommodations, Defendant caused Plaintiff serious and significant harm.

312.    Plaintiff missed the cutoff for promotion to Sergeant by *two points*, which had a lasting and material impact on her income.

313.    Plaintiff asserts that had she been given the accommodation, she would have performed better on the exam and been promoted.

314.    Plaintiff asserts that Defendant violated applicable federal and state statutes in refusing to accommodate her disabilities.

315.    As a direct and proximate result of Defendant's actions, Plaintiff suffered severe mental and emotional anguish, as well as lost career opportunity and promotion.

316.    Plaintiff now seeks compensatory damages of not less than $600,000 for each claim, plus attorney's fees, costs, litigation fees and interest.

317.    Plaintiff further seeks injunctive relief in the form of an ORDER mandating that she be immediately promoted to Sergeant, retroactive to the date of the posting of the promotional roster, and that she be made whole as if she was promoted at that time.

**PRAYER FOR RELIEF**

318.    Plaintiff seeks compensatory damages of not less than $5,000,000.00.

319.    Plaintiff seeks an ORDER awarding Plaintiff costs, fees, attorney's fees and interest.

320.    Plaintiff seeks an ORDER promoting her to Sergeant, and making her whole as if she was promoted at the posting of the last register.

321.    Plaintiff seeks an ORDER finding that MPD's EEO policies and practices are unconstitutional and violate the civil rights of officers at MPD.

322.    Plaintiff seeks an ORDER finding that MPD's policies, practices and procedures with respect to pregnant officers violate Title VII of the Civil Rights Act of 1967, and the DCHRA provisions prohibiting discrimination and retaliation based on pregnancy.

323.    Any and all other remedies the jury or Court finds appropriate.


**JURY TRIAL**

324.    Plaintiff seeks a jury trial on all matters so triable.



Respectfully submitted,

/s/Pamela M. Keith
Pamela M. Keith [Bar No. 448421]
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
Tel: (202) 800-0292
Fax: (202) 807-5725
pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiff*

41